12 CIV 8610

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| LEONA SESHOLTZ and ALEXANDER W. THIELE, on behalf of themselves and all others similarly situated, | ) ) ) Case No. |
| Plaintiffs, | ) ) **CLASS ACTION COMPLAINT** |
| v. | ) ) **JURY TRIAL DEMANDED** |
| HI-CRUSH PARTNERS LP, ROBERT E. RASMUS, JAMES M. WHIPKEY, LAURA C. FULTON, JEFFRIES V. ALSTON III, ROBERT L. CABES, JR., JOHN R. HUFF, TREVOR T. TURBIDY, STEVEN A. WEBSTER, MORGAN STANLEY & CO. LLC, BARCLAYS CAPITAL INC., CREDIT SUISSE SECURITIES (USA) LLC, RBC CAPITAL MARKETS LLC, UBS SECURITIES LLC, RAYMOND JAMES & ASSOCIATES, and ROBERT W. BAIRD & CO. INCORPORATED, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Plaintiffs below, individually and on behalf of the class described below, allege this class

action complaint based upon their own personal knowledge, as to their own acts, and upon the

investigation of their counsel.  Counsel's investigation conducted on plaintiffs' behalf, included,

among other things: (i) an analysis of publicly-available news articles and reports; (ii) a review

and analysis of public filings, including but not limited to SEC filings by defendants; (iii) press

releases issued by defendants; (iv) research of facts and the applicable law with respect to the

claims asserted herein including the use of sophisticated investigatory tools such as *Bloomberg*

subscription services, *Lexis Nexis* and other subscription services, and (v) other matters of public record.

## NATURE OF THE ACTION

1.     This is a federal securities class action brought by plaintiffs alleging claims under Sections 11, 12, and 15 of the Securities Act of 1933 ("Securities Act") against defendants, seeking to recover damages caused to the Class by defendants' violations of the Securities Act.

2.     Hi-Crush Partners LP (the "Partnership") is managed and operated by the board of directors and executive officers of its general partner, Hi-Crush GP LLC (the "General Partner" or the "Company"), a wholly owned subsidiary of its sponsor, Hi-Crush Proppants LLC ("Proppants"). (The Partnership, the General Partner and Proppants may together be referred to as "Hi-Crush" or the "Company.")

3.     Hi-Crush Partners is a low-cost, domestic producer of premium monocrystalline sand, a specialized mineral that is used by natural gas providers as a proppant ("frac sand") to enhance the recovery rates of hydrocarbons from oil and natural gas wells.  The Company's reserves consist of Northern White sand, predominately found in Wisconsin and limited portions of the upper Midwest region of the United States, and is highly valued as a preferred frac sand due to its favorable physical characteristics.

4.     According to its website, substantially all of the "Company's frac sand production is sold to leading investment grade-rated pressure pumping service providers under **long-term, take-or-pay contracts** that require our customers to pay a specified price for a specified volume of frac sand each month." (emphasis added)  Accordingly, the stable revenue from long-term contracts are the lifeblood of Hi-Crush's business.

5.     On August 21, 2012, the Partnership completed its initial public offering ("IPO") of 12,937,500 common units representing limited partner interests in the Partnership ("Common

2

Units") sold by Proppants at a price to the public of $17 per common unit under the symbol "HCLP."

6.      The offering was described in a Form S-1 Registration Statement filed with the SEC and disseminated to investors on July 6, 2012.[1]  Among other things, the Prospectus touted the existence and benefit of specific lucrative long-term contracts with large customers, including Baker Hughes Incorporated ("Baker Hughes"), FTS International, LLC ("FTS"), Halliburton Company ("Halliburton"), and Weatherford International Ltd. ("Weatherford").

7.      The Prospectus, however, contained numerous false and misleading statements regarding one of Hi-Crush's largest customers, Baker Hughes.  For instance, the Prospectus failed to inform shareholders that Baker Hughes had sought to change the material terms of its contract with the company as early as February 2012 and was threatening to cancel its contract altogether prior to the issuance of the Prospectus.  Further, the Prospectus failed to inform shareholders that Baker Hughes began refusing to take or pay for Hi-Crush's sand, prior to the IPO and the issuance of the accompanying prospectus.

8.      The long-term contract with Baker-Hughes was unquestionably material to the success of the Company and the IPO.  Indeed, according to Hi-Crush it represented 18.2% of the Company's revenue in 2012, or over $14 million of a total $79 million in 2012 revenues based on the Company's estimates.

9.      It was not until after the IPO that the truth about the problems with Baker Hughes began to emerge.  On November 13, 2012, the Company issued a press release which stated in pertinent part:

---

[1] Amended Form S-1 Registration Statements were filed with the SEC on August 3, 2012 and August 7, 2012 (the "Prospectus").

Hi-Crush also announced today the termination of the supply agreement with Baker Hughes Oilfield Operations, Inc. On September 19, 2012, Baker Hughes provided notice that it was terminating the contract. Hi-Crush believes that Baker Hughes' termination was wrongful and a direct effort to circumvent its binding purchase obligations under the supply agreement. Hi-Crush engaged in discussions with Baker Hughes after receiving the notice, but the parties were unable to reach a mutually satisfactory resolution of the matter. On November 12, 2012, Hi-Crush formally terminated the supply agreement and filed suit in the State District Court of Harris County, Texas against Baker Hughes seeking damages for Baker Hughes' prior wrongful termination of the supply agreement. "We believe in the strength of our contracts and intend to vigorously enforce our rights under the supply agreement against Baker Hughes," said Jim Whipkey, Co-CEO of Hi-Crush. "This is an isolated incident and does not affect our estimated cash distributions to our unitholders. We reinforce our 2013 minimum quarterly distribution guidance of $0.475 per unit, or $1.90 on an annualized basis."

10.     The timing of the events leading up to the IPO illustrate the importance of the Baker Hughes contract to the IPO investors. The Hi-Crush IPO was commenced on August 16, 2012 at a price of $17 per Common Unity. It reached its closing high of $22.74 per Common Unit just over one month later, on September 24, 2012. It was just five (5) days later that Baker Hughes, unbeknownst to investors, terminated its contract with the Company. As a result of the Company's disclosure of its loss of the Baker Hughes contract on November 13, 2012, the price of Hi-Crush Common Units dropped $5.35 to close at $15.00, a one-day decline of over 26%.

11.     Plaintiffs seek to recover pursuant to Sections 11, 12 and 15 of the Securities Act of 1933 for the material misstatements and omissions contained in the Prospectus. Defendants, individually and collectively, had a responsibility to plaintiffs and the Class to ensure that the Prospectus did not contain material misstatements or omit to disclose all material information about Hi-Crush. As a result of Defendants' failure to do so, Plaintiff and other members of the Class have suffered substantial damage pursuant to Sections 11, 12 and 15 of the Securities Act.

4

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act of 1933 and 28 U.S.C. Section 1331 and Section 1337.

13.     Plaintiffs bring this action pursuant to 15 U.S.C. Sections 77(k), 77(l) and 77(o) of the Securities Act.

14.     Venue is proper in this District because defendants conduct business in this District and many of the wrongful acts alleged herein took place or originated in this District.

15.     Most of the defendants are headquartered or located in this district, or maintain significant business presences here.

16.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

17.     Shares of Hi-Crush are a security within the meaning of federal law.

18.     Shares of Hi-Crush were sold to class members who reside within this judicial district.

## PARTIES

**Plaintiffs**

19.     Plaintiff Leona Sesholtz, on August 27, 2012, purchased shares of Hi-Crush, issued by the Company, pursuant and/or traceable to the Prospectus and was damaged thereby as evidenced by her annexed Certification.

20.     Plaintiff Alexander W. Thiele, on August 20, 2012, through November 15, 2012, purchased shares of Hi-Crush, issued by the Company, pursuant and/or traceable to the Prospectus and was damaged thereby as evidenced by his annexed Certification.

**Defendants**

21.     Defendant Hi-Crush has its principal executive offices located at Three Riverway, Suite 1550, Houston, TX 77056, within this judicial district, and is incorporated under the laws of the state of Delaware.  Hi-Crush Partners is a domestic producer of premium monocrystalline sand, a specialized mineral that is used as a proppant to enhance the recovery rates of hydrocarbons from oil and natural gas wells. Its reserves consist of Northern White sand, predominately found in Wisconsin and limited portions of the upper Midwest region of the United States, and is highly valued as a preferred proppant due to its favorable physical characteristics.

22.     Substantially all of the Company's frac sand production is sold to leading investment grade-rated pressure pumping service providers under **long-term, take-or-pay contracts** that require our customers to pay a specified price for a specified volume of frac sand each month.

**Individual Defendants**

23.     Defendant Robert E. Rasmus ("Rasmus") has been Co-Chief Executive Officer ("CEO") of Hi-Crush Proppants LLC since its formation in October 2010. Rasmus was named Co-CEO of the General Partner in May 2012. Rasmus was a founding member of Red Oak Capital Management LLC, was the President of Thunderbolt Capital Corp., a venture firm focused on start-up and early stage private equity investments, was the Senior Managing Director of Banc One Capital Markets, and was the Managing Director and Head of Investment Banking in London for First Chicago Ltd. Rasmus signed the Registration Statement containing the Prospectus dated August 7, 2012.

24.     Defendant James M. Whipkey ("Whipkey") is a co-founder of Hi-Crush Proppants LLC and has served as its Co-CEO since its formation in October 2010. Whipkey was named Co-CEO of the General Partner in May 2012. Whipkey was previously an equity analyst covering the exploration and production sector, most recently as a Managing Director at ABN Amro Bank N.V. From 1997 to 2000, Whipkey was the Chief Financial Officer ("CFO") and Treasurer for Benton Oil and Gas Company. Prior thereto, Whipkey worked in a number of investment banking positions managing a wide range of relationships and responsibilities in the energy sector. His various roles included energy derivatives trading at Phibro Energy Inc., investment banking at Kidder, Peabody & Co., and stock analysis at Lehman Brothers Holdings Inc. Whipkey signed the Registration Statement containing the Prospectus dated August 7, 2012.

25.     Defendant Laura C. Fulton ("Fulton") has served as the CFO of Proppants since April 2012 and CFO of the General Partner since May 2012. Fulton signed the Registration Statement containing the Prospectus dated August 7, 2012.

26.     Defendant Jeffries V. Alston III ("Alston") has served as Chief Operating Officer ("COO") of Proppants since May 2011 and was appointed COO of the General Partner in May 2012. Alston signed the Registration Statement containing the Prospectus dated August 7, 2012.

27.     Defendant Robert L. Cabes, Jr. ("Cabes") has served as a director Proppants LLC since May 2011 and was appointed to the board of directors of the general partner in May 2012. Cabes has been a Partner of Avista Capital Partners, a private equity firm, since June 2005. From April 2001 to June 2005, Cabes served as Principal of Global Energy Partners, Ltd. ("GEP") a specialty group within Credit Suisse's asset management business that made investments in energy companies. Prior to joining GEP, Cabes was with Credit Suisse's and Donaldson, Lufkin & Jenrette's Investment Banking Divisions where he worked on debt and equity securities

underwriting and mergers and acquisitions for energy companies. Cabes signed the Registration Statement containing the Prospectus dated August 7, 2012.

28.     Defendant John R. Huff ("Huff") has served as a director of Proppants since May 2011 and was appointed to the board of directors of the General Partner in May 2012. Huff signed the Registration Statement containing the Prospectus dated August 7, 2012.

29.     Defendant Trevor T. Turbidy ("Turbidy") has served as a director of Proppants since May 2011 and was appointed to the board of directors of the General Partner in May 2012. Turbidy has served as an energy industry advisor for Avista Capital Partners since 2007.  Prior to that, Turbidy was CFO of Trico where he was the Chief Restructuring Officer during the company's restructuring and subsequently CEO after its successful completion. Prior to his service at Trico, Turbidy spent more than a decade with Donaldson, Lufkin & Jenrette Inc. ("DLJ") and Credit Suisse First Boston in their investment banking divisions. Turbidy signed the Registration Statement containing the Prospectus dated August 7, 2012.

30.     Defendant Steven A. Webster ("Webster") was previously a director of the Company and signed the Registration Statement containing the Prospectus dated August 7, 2012.

31.     These eight individual defendants are collectively referred to as the "Individual Defendants."

**Underwriter Defendants**

32.     The following underwriter defendants were the underwriters for the Hi-Crush IPO.

33.     Defendant Morgan Stanley & Co. LLC, the lead underwriter, is located at 1585 Broadway, New York, NY 10036.

34.     Defendant Barclays Capital Inc. is located at 200 Park Ave., New York, NY 10166.

35.     Defendant Credit Suisse Securities (USA) LLC is located at 11 Madison Ave., New York, NY 10010.

36.     Defendant RBC Capital Markets LLC is located at 3 World Financial Center, 200 Vesey St., New York, NY 10281.

37.     Defendant UBS Securities LLC is located at 677 Washington Boulevard, Stamford, CT 06901.

38.     Defendant Raymond James & Associates is located at 880 Carillon Parkway, St. Petersburg, FL 33716.

39.     Defendant Robert W. Baird & Co. Incorporated is located at 777 East Wisconsin Avenue, Milwaukee, WI 53202.

40.     These seven defendant underwriters are collectively referred to as the "Underwriter Defendants."

41.     All defendants are collectively referred to as "Defendants."

## CLASS ACTION ALLEGATIONS

42.     Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all investors that purchased Hi-Crush Common Units pursuant or traceable to the Prospectus (the "Class").

43.     Members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members of the Class located throughout the United States.

44.     According to the Prospectus, 11,250,000 Common Units were sold to the public on the IPO and on August 16, 2012, the Underwriters exercised their Over-Allotment Options and purchased 1,687,500 Additional Units on the same terms.

45.     Hi-Crush Common Units were sold to Class members during the Class Period pursuant to the Prospectus.

46.     All members of the Class may readily be identified from records maintained by Hi-Crush and/or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

47.     Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and the other members of the Class, by virtue of their purchases of shares of Hi-Crush on, or pursuant to the IPO, have sustained damages as a result of Defendants' unlawful activities as alleged herein.   Plaintiffs have retained counsel competent and experienced in class and securities litigation and intend to prosecute this action vigorously.   Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs have no interests that are contrary to, or in conflict with, those of the Class that plaintiffs seek to represent.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.   Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

49.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)     Whether the Securities Act was violated by Defendants' acts;

(b)     Whether each of the Defendants participated in the course of conduct complained of herein; and

(c)     Whether members of the Class have sustained damages as a result of Defendants' conduct, and the proper measure of such damages including but not limited to rescissionary damages.

## THE PROSPECTUS CONTAINED MATERIAL MISSTATEMENTS AND OMITTED MATERIAL INFORMATION

50.     In order to facilitate the IPO, Hi-Crush entered into an Underwriting Agreement (the "Underwriting Agreement"), among the Partnership, the General Partner, Proppants, and Barclays Capital Inc. and Morgan Stanley & Co. LLC, as representatives of several underwriters, providing for the offer and sale by Proppants, and purchase by the Underwriters, of 11,250,000 Common Units at a price to the public of $17.00 per Common Unit ($15.95875 per Common Unit, net of underwriting discounts).  Pursuant to the Underwriting Agreement, Proppants also granted the Underwriters an option for a period of 30 days (the "Over-Allotment Option") to purchase up to an additional 1,687,500 Common Units (the "Additional Units") on the same terms. On August 16, 2012, the Underwriters exercised the Over-Allotment Option in full.

51.     Hi-Crush through its underwriters sold approximately 12,937,500 Common Units on the IPO, priced at $17 per Common Unit and resulted in the Company raising $206 million for itself and the selling stockholders.

52.     The Prospectus contained material misstatements and statements made materially inaccurate through the omission of material facts.  These include the following statements, which appear in the Prospectus:

- "Substantially all of our sales are generated under contracts with four customers, and the loss of or reduced purchasing by any of them could adversely affect our results of operations." Prospectus Cover.

- "Our current customer base is comprised of subsidiaries of four of North America's largest providers of pressure pumping services: Baker Hughes Incorporated ("Baker Hughes"), FTS International, LLC. ("FTS International"), Halliburton Company ("Halliburton") and Weatherford International Ltd. ("Weatherford"). Our largest customers based on current contracts, Baker Hughes and Halliburton, are each rated A2 / A by Moody's and Standard & Poor's, respectively, and Weatherford is rated Baa2 / BBB by these agencies." Prospectus at 2.

- "We sell substantially all of the frac sand we produce under long-term, take-or-pay contracts that significantly reduce our exposure to short-term fluctuations in the price of and demand for frac sand. For the year ended December 31, 2011 and the first half of 2012, we generated 99% of our revenues from frac sand delivered under our long-term sand sales contracts, and we expect to continue selling a significant majority of our sand under long-term contracts. As of June 30, 2012, we had four long-term sand sales contracts with a weighted average remaining life of approximately 4.6 years. The following table presents a summary of our contracted volumes and revenues from 2011 through 2015, as well as the average contract sales price and make-whole price our customers are obligated to pay in the event they decline to accept delivery of the required product volumes under their respective contracts." Prospectus at 3.

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 2014 | 2015 |
| Contracted Volumes (tons) | 331,667 | 1,216,667 | 1,460,000 | 1,295,000 | 1,130,000 |
| % of Processing Capacity(1) | 79% | 85% | 91% | 81% | 71% |
| Contracted Revenue | $19,916,667 | $78,966,667 | $96,466,667 | $88,350,000 | $80,100,000 |
| Average Sales Price per ton | $60 | $65 | $66 | $68 | $71 |
| Average Make-Whole Price per ton | $60 | $49 | $49 | $51 | $51 |

(1) Percentage of processing capacity for 2011 and 2012 based on weighted average processing capacity for such periods.

- "As the above table illustrates, when one of our contracts expires in 2014, the average contracted price per ton will increase. The expiring contract provides for sales prices lower than current market prices. Prior to this contract's expiration, we will seek to renew or replace this contract on pricing terms more comparable to market prices at the time. Occasionally, if we have excess production and market conditions are favorable, we may elect to sell frac sand in spot market transactions. The terms of our customer contracts, including sand quality requirements, quantity parameters, permitted sources of supply, effects of future regulatory changes, force majeure and termination and assignment provisions, vary by customer. As indicated in the above table, our

customer contracts contain penalties for non-performance by our customers, with make-whole prices averaging approximately $49 per ton in 2012. If one of our customers fails to meet its minimum obligations to us, we would expect that the make-whole payment, combined with a decrease in our variable costs (such as royalty payments and excavation costs), would substantially mitigate any adverse impact on our cash flow from such failure." Prospectus at 3.

- *"Focusing on stable, long-term, take-or-pay contracts with key customers.* A key component of our business model is our contracting strategy, which seeks to secure a high percentage of our cash flows under long-term, fixed price contracts with take-or-pay provisions, while also staggering the tenors of our contracts so that they expire at different times. We believe this contracting strategy significantly mitigates our exposure to the potential price volatility of the spot market for frac sand in the short-term, allows us to take advantage of any increase in frac sand prices over the medium-term and provides us with long-term cash flow stability. As current contracts expire or as we add new processing capacity, we intend to pursue similar long-term contracts with our current customers and with other leading pressure pumping service providers. We intend to utilize nearly all of our processing capacity to fulfill these contracts, with any excess processed frac sand first offered to existing customers and the remaining amount sold opportunistically in the spot market." Prospectus at 5.

- *"Long-term contracted cash flow stability.* We will generate substantially all of our revenues from the sale of frac sand under long-term contracts that require subsidiaries of Baker Hughes, FTS International, Halliburton and Weatherford to pay specified prices for specified volumes of product each month. We believe that the take-or-pay volume and pricing provisions and the long-term nature of our contracts will provide us with a stable base of cash flows and limit the risks associated with price movements in the spot market and any changes in product demand during the contract period. We are currently contracted to sell 1,460,000 tons of frac sand annually from our Wyeville facility, and as of June 30, 2012, our contracts had a weighted average remaining life of approximately 4.6 years." Prospectus at 6.

- *"Substantially all of our sales are generated under contracts with four customers, and the loss of, or significant reduction in purchases by, any of them could adversely affect our business, financial condition and results of operations.* During the year ended December 31, 2011, subsidiaries of Weatherford and Halliburton accounted for 100% of our sales. We commenced sales under our new contracts with subsidiaries of Baker Hughes and FTS International in May 2012, and expect that our four customers will represent all of our sales in 2012. We have fixed price, take-or-pay supply agreements with each of these customers, with remaining terms ranging from 10 to 70 months, as of June 30, 2012." Prospectus at 27.

- "This shortfall is primarily attributable to the fact that neither the twelve nor six months ended June 30, 2012 reflected the full impact of our Wyeville plant expansion, which was completed in March 2012, and sales under new contracts with subsidiaries of Baker Hughes and FTS International associated with the expansion, which commenced in May 2012." Prospectus at 60.

- "As we discuss in further detail below, we believe that increased income from a full year's operation of the Wyeville facility, the completion of our plant expansion in March 2012, the termination of certain royalty agreements in July 2012 and commencement of deliveries under our contracts with subsidiaries of Baker Hughes and FTS International in May 2012 will result in our generating higher cash available for distribution for the twelve months ending September 30, 2013. The assumptions and estimates we have made to support our ability to generate the estimated cash available for distribution are set forth below. **** All of the revenues estimated for the forecast period are expected to be generated from long-term sales contracts that require our customers to pay a specified price for a specified volume each month. Accordingly, our estimate of total revenue for the twelve months ending September 30, 2013 is based on our current operating capacity and the pricing terms and volume commitments specified in our long-term sales contracts rather than on our historical revenues. Our estimate assumes that we will make sales of our total contracted volume of 1,460,000 tons of frac sand at contract prices over the forecast period. We generated $54.5 million in revenues for the twelve months ended June 30, 2012. The expected $41.9 million increase in our revenues from the twelve months ending September 30, 2013, compared to the twelve months ended June 30, 2012, is primarily due to 588,150 tons of incremental frac sand sales that were contracted as part of the March 2012 plant expansion." Prospectus at 65.

- "Beginning May 1, 2012, we commenced shipments to two additional customers, subsidiaries of Baker Hughes and FTS International, under similar contracts. Each contract defines the minimum volume of frac sand that the customer is required to purchase monthly and annually, the volume that we are required to make available, the technical specifications of the product, the price per ton and liquidated damages in the event either we or the customer fails to meet minimum requirements. Prices in our current contracts are fixed for the entire term of the contracts. As a result, our revenue over the duration of these contracts may not follow broader industry pricing trends. Occasionally, if we have excess production and market conditions are favorable, we may elect to sell frac sand in spot market transactions." Prospectus at 89.

- "Approximately 91% of our processing capacity at the Wyeville facility for the remainder of 2012 and through the second quarter of 2014 is contracted for sale under our existing fixed price, take-or-pay contracts with our customers, and 71% of our processing capacity is contracted for the remainder of 2014 through the second quarter of 2016." Prospectus at 91.

14

- "In October 2011, we signed a long term, take-or-pay contract with a third customer, a subsidiary of Baker Hughes. In May 2012, we signed a one year take-or-pay contract with a fourth customer, a subsidiary of FTS International. Sales to Baker Hughes and FTS International accounted for the balance of revenue in the six months ended June 30, 2012. Based on contracted volumes and pricing, sales to Halliburton, Weatherford, **Baker Hughes** and FTS International will represent 49.1%, 20.9%, **18.2%** and 11.8% of our contracted revenue in 2012, respectively." Prospectus at 99 (emphasis added).

- *"Long-term contracted cash flow stability.* We will generate substantially all of our revenues from the sale of frac sand under long-term contracts that require subsidiaries of Baker Hughes, FTS International, Halliburton and Weatherford to pay specified prices for specified volumes of product each month. We believe that the take-or-pay volume and pricing provisions and the long-term nature of our contracts will provide us with a stable base of cash flows and limit the risks associated with price movements in the spot market and any changes in product demand during the contract period. We are currently contracted to sell 1,460,000 tons of frac sand annually from our Wyeville facility, and as of June 30, 2012, our contracts had a weighted average remaining life of approximately 4.6 years." Prospectus at 114.

- "Our current customer base is comprised of subsidiaries of four of North America's largest providers of pressure pumping services, Baker Hughes, FTS International, Halliburton and Weatherford. Our largest customers based on current contracts, Baker Hughes and Halliburton, are each rated A2 / A by Moody's and Standard & Poor's, respectively, and Weatherford is rated Baa2 / BBB by these agencies. FTS International Services LLC, the subsidiary of FTS International that is the counterparty to our customer contract, is rated Ba3 / B by these agencies. Spears and Associates estimates that these four companies controlled 47% of North American pressure pumping fleet in 2011 and accounted for greater than 50% of the North American pressure pumping market, based on 2011 revenue. For the year ended December 31, 2011, sales to Halliburton and Weatherford accounted for 64% and 36% of our total revenues, respectively. Sales under our contracts with Baker Hughes and FTS International commenced in May 2012." Prospectus at 121.

53.    Each of these statements in the Prospectus contained material misstatements, omitted to state a material fact required to be stated therein, or failed to disclose certain material facts necessary to make the statements therein not misleading, because each failed to materially disclose that Baker Hughes had sought to modify and then cancel its contract with Hi-Crush prior to the IPO.

54.     The agreement with Baker Hughes was material to the success of the Company, representing approximately 18.2% of its projected 2012 revenue, and the loss of the contract makes Hi-Crush a much less attractive investment, as evinced by the decline of its share price following the disclosure of the cancellation of the Baker Hughes contract.

55.     A early as February 2012, Baker Hughes had attempted to modify its contract with Hi-Crush, and on September 19, 2012, the contract was terminated.  It was not until November 13, 2012, however, that the Company finally disclosed the loss of the Baker Hughes contract when it filed a Form 8-K with the SEC which stated:

> In May 2012, Hi-Crush Operating LLC ("Hi-Crush"), a subsidiary of Hi-Crush Partners LP (the "Partnership"), entered into a supply agreement for frac sand with Baker Hughes Oilfield Operations, Inc. ("Baker Hughes"). On September 19, 2012, Baker Hughes provided notice that it was terminating the contract. The Partnership believes that Baker Hughes' termination was wrongful and a direct effort to circumvent its binding purchase obligations under the supply agreement. The Partnership engaged in discussions with Baker Hughes after receiving the notice, but the parties were unable to reach a mutually satisfactory resolution of the matter. On November 12, 2012, Hi-Crush formally terminated the supply agreement and filed suit in the State District Court of Harris County, Texas against Baker Hughes seeking damages for Baker Hughes' prior wrongful termination of the supply agreement. The Partnership intends to vigorously enforce its rights under the supply agreement against Baker Hughes. The Partnership cannot provide assurance, however, as to the outcome of this lawsuit.

56.     As referred to in the above Form 8-K, Hi-Crush filed a complaint against Baker Hughes for breach of contract on November 12, 2012, styled *Hi-Crush Operating LLC v. Baker Hughes Oilfield Operations, Inc.*, in the District Court of Harris County, Texas.

57.     The complaint's averments reveal that the Prospectus omitted material information concerning the facts attendant to the Baker Hughes contract. For example, the complaint states that, "[b]eginning in February 2012-before the Supply Agreement even took

effect- Baker approached Hi-Crush seeking to reduce the amount of sand it was required to take under the Supply Agreement." Harris County complaint at ¶11.

58.     Despite this information being available months before the IPO, the Prospectus omitted all information indicating Baker Hughes contacted the Company, as early as February 2012, in an attempt to reduce the amount of sand it was required to purchase from Hi-Crush under the existing Supply Agreement.

59.     The complaint further states that on September 19, 2012, "Baker [Hughes] sent Hi-Crush a letter purporting to terminate the Supply Agreement based on two meritless allegations that Hi-Crush had breached the *confidentiality obligations* contained in Article 6 of the Supply Agreement." Harris County complaint at ¶15.

60.     Again, the Prospectus failed to explicate the facts associated with breeches of the Supply Agreement, including the receipt of the Baker Hughes letter.  As noted above, Baker Hughes' termination letter was not disclosed to the public until November 13, 2012.

61.     The Harris County complaint also states that "[o]n September 25, 2012, Hi-Crush sent Baker a formal response setting forth the numerous reasons that Baker's purported termination of the Supply Agreement was wrongful and ineffective.  Hi-Crush notified Baker that its purported termination and repudiation of the Supply Agreement, along with its **continuing refusal** to take or pay for Hi-Crush's sand, was itself a material breach by Baker of the Supply Agreement. Harris County complaint at ¶16 (emphasis added).

62.     From the above statement, it is clear that Baker Hughes began refusing to take or pay for Hi-Crush's sand, prior to the IPO and the issuance of the accompanying prospectus, which took place little more than one month prior to the Company's September 25, 2012 formal response to Baker Hughes.  Nowhere in the Prospectus does the Company disclose that Baker

Hughes was refusing (and continuing to refuse) to take or pay for Hi-Crush's sand - a clear risk to the contract with Baker Hughes.

63.    The Hi-Crush IPO went public on August 16, 2012 at a price of $17 per Common Unity.  It reached its closing high of $22.74 per Common Unit just over one month later. As a result of the Company's November 13, 2012 disclosure that it lost the Baker Hughes contract, however, the price of Hi-Crush Common Units dropped $5.35 to close at $15.00, a one-day decline of over 26%. The following chart shows the closing price for Hi-Crush Common Units since the IPO.



64.    Any reasonable investor would have found it valuable to know the facts surrounding the uncertainties with the Baker Hughes contract prior to making her investment decision.  Nonetheless, the Prospectus omits all information concerning Baker Hughes' actions to modify and repudiate the contract.

65.     Indeed, the Company raised over $271 million dollars absent disclosing material information in the Prospectus.

66.     Similarly, the Underwriter Defendants earned over $14.5 million in underwriting and structuring fees from sales of Hi-Crush Common Units in the IPO – absent circulating a fulsome and complete Prospectus.

## NO SAFE HARBOR

67.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Virtually all of the specific statements pleaded herein were not forward-looking or were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements upon which plaintiffs base their claims, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of defendants who knew that those statements were false when made.

68.     The safe harbor does not apply to statements made, as here, in connection with an initial public offering.

## FIRST CLAIM FOR RELIEF

### (Against All Defendants for Violations
of Section 11 of the Securities Act)

69.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth

herein.

70.     Plaintiffs do not allege that the material omissions and material misstatements set forth herein were made intentionally, knowingly or recklessly by Defendants.

71.     Plaintiffs brought this action within one year after the discovery of the materially incorrect statements and omissions, and within three years after the shares were offered to the public through the Prospectus.

72.     This claim is brought by Plaintiffs against all Defendants.

73.     The Company was the issuer of the Prospectus and sold the shares pursuant to the Prospectus.

74.     Each of the Individual Defendants signed the Registration Statement.

75.     Each of the Underwriter Defendants served as a co-managing underwriter of the Offering, and is identified as such by, among other things, their listing "on the cover" of the Prospectus.  Each of the Underwriter Defendants is also liable for the material misstatements and material omissions in the Prospectus and is therefore also liable to Plaintiffs and the members of the Class under Section 11.

76.     Each of the Individual Defendants participated in the preparation of, caused to be issued and/or participated in the issuance of the Prospectus, and signed the Registration Statement, each of which was inaccurate and contained material misstatements; omitted to state a material fact required to be stated therein, or failed to disclose certain material facts necessary to make the statements therein not misleading, as set forth herein.

77.     Each of the Underwriter Defendants participated in the preparation of, caused to be issued and/or participated in the issuance of the Prospectus which was inaccurate and contained material misstatements; omitted to state a material fact required to be stated therein, or

failed to disclose certain material facts necessary to make the statements therein not misleading, as set forth herein.

78.    The Individual Defendants did not make a reasonable investigation, failed to exercise reasonable due diligence, and/or had no reasonable grounds to believe, that the Prospectus issued by the Company was free of material misstatements and material omissions at the time those document was filed, and they are therefore also liable to Plaintiffs and the members of the Class under Section 11.

79.    Plaintiffs allege that all statutory affirmative defenses available to only Underwriter Defendants under Sections 11 and 12 are affirmative defenses which those defendants must plead and prove and which plaintiffs need not allege.  Nevertheless, Plaintiffs address the underwriter affirmative defenses below.

80.    While the following concerns an affirmative defense which can be raised by the Underwriter Defendants only, and concerning which each of them bears the burden of proof, nevertheless, Plaintiffs allege that each Underwriter Defendant did not make a reasonable investigation, did not possess reasonable grounds to believe, and did not believe, that the statements contained in the Prospectus were true, were without omissions of any material facts and were not misleading.  Each Underwriter Defendant participated in the preparation of the Prospectus, and was required to investigate with due diligence the statements contained therein to confirm that they did not contain material misstatements or omitted to state material facts, but each of the Underwriter Defendants did not perform this investigation with due diligence. (Indeed, the underwriter defendant had a substantial direct interest in the success of the offering, as detailed above.)

81.    Each Underwriter Defendant, as the result of engaging in the routine conduct of

their business or through common sense, was negligent (without limitation) as follows:

> (a)    in not knowing that their misstatements and omissions were material;

> (b)    in not knowing that the statements concerning the Company's long-term contracts were materially inaccurate.

82.    The Prospectus, at the time it became effective, was inaccurate and contained material misstatements of fact; omitted to state material facts required to be stated therein, or failed to disclose certain material facts necessary to make the statements therein not misleading, as set forth herein.

83.    The facts misstated and omitted would have been material to a reasonable person reviewing the Prospectus.

84.    Plaintiffs and the other Class members did not know and, in the exercise of reasonable diligence, could not have known of the material misstatements and material omissions contained in the Prospectus at the time of their purchases, during the Class Period.

85.    During the Class Period, Plaintiffs and the other members of the Class purchased in the IPO approximately 12,937,500 Common Units of Hi-Crush.

86.    Although not required to be alleged with respect to this claim because it is an affirmative defense to be alleged and proven by Defendants, nevertheless, Plaintiffs allege that Plaintiffs and the other members of the Class purchased their Hi-Crush shares as a direct and proximate result of, and/or without knowledge of, the material misstatements and omissions in the Prospectus.  Plaintiffs and/or other members of the class would not have purchased their Hi-Crush shares from Defendants if the material misstatements and material omissions in the Prospectus had not been made by Defendants.

87.    By virtue of the foregoing, each of the defendants on this Section 11 claim

violated Section 11 of the Securities Act, and is liable to Plaintiffs and the other members of the Class.

88.     As a direct and proximate result of Defendants' unlawful conduct as alleged herein, Plaintiffs and the other members of the Class sustained damages in connection with their purchase of Hi-Crush shares during the Class Period pursuant to or traceable to the Prospectus in an amount in excess of $60 million, the exact amount to be proven at trial.

89.     Plaintiffs and the members of the Class acquired their shares pursuant or traceable to the Company's Prospectus which was rendered materially inaccurate as a result of Defendants' misstatements and omissions.

## SECOND CLAIM FOR RELIEF

### (Against the Underwriter Defendants for Violations of Section 12(a)(2) of the Securities Act)

90.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

91.     Plaintiffs do not allege that the material omissions and material misstatements set forth herein were made intentionally, knowingly or recklessly by Defendants.

92.     Plaintiffs brought this action within one year after the discovery of the materially incorrect statements and omissions, and within three years after the shares were offered to the public through the Prospectus.

93.     The Company, as the issuer of the shares, reaped over $270 million from the IPO.

94.     The Underwriter Defendants made over $14.5 million in underwriting fees from sales of Hi-Crush shares in the IPO, fees that they would not have made if the Prospectus had not contained material misstatements and material omissions.

95.     Each of the defendants on this claim was a seller, offerer and/or solicitor of

purchases of the Company's shares, pursuant to the Prospectus, for their own financial benefit.

96.     Each of the defendants' acts of selling, offering and/or soliciting included but was not limited to the preparation of the Prospectus that contained the material misstatements and material omissions, and their issuance and dissemination to public investors.

97.     Each of the defendants' acts of selling, offering and/or soliciting was a substantial factor with respect to the purchase of the Company's shares by Plaintiffs and the members of the Class.

98.     But for the Defendants' selling and/or solicitation activities by means of the materially incorrect Prospectus, Plaintiffs and the members of the Class would not have purchased their Hi-Crush Common Units or would have acquired them at a price less than they actually paid.

99.     While the following concerns an affirmative defense which can be raised by only the section 12 defendants, and concerning which they bear the burden of proof, nevertheless, plaintiffs allege that each of these defendants cannot prove that it:  (a) did not know of such material misstatement or omission and (b) in the exercise of reasonable care could not have known of such material misstatement or omission.

100.     Plaintiffs and the other members of the Class purchased their shares in the initial public offering which makes all shares purchased in and of themselves traceable to the offering.

101.     Plaintiffs and the other members of the Class purchased their Hi-Crush Common Units pursuant to the written Prospectus herein, and without knowledge of the material misstatements and omissions in the Prospectus.

102.     The Hi-Crush shares sold to Plaintiffs and the other members of the Class during the Class Period lost at least tens of millions of dollars in value, and possibly more.

103. As a direct and proximate result of defendants' unlawful conduct as alleged herein, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Hi-Crush Common Units during the Class Period.

104. By virtue of the foregoing, each of the defendants on this Section 12 claim is primarily liable under Section 12(a)(2) of the Securities Act, and each is primarily liable to Plaintiffs and other members of the class.

105. Plaintiffs, individually and representatively, hereby elect to rescind and tender those securities that plaintiffs and the other members of the Class continue to own, in return for the consideration paid for those securities together with interest thereon. Plaintiffs and members of the Class who have sold their Hi-Crush Common Units are entitled to rescissory damages, in an amount to be proved at trial.

## THIRD CLAIM FOR RELIEF

### (Against the Individual Defendants for
### Control Person Liability Under Section 15 of the Securities Act)

106. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

107. Plaintiffs do not allege that the material omissions and material misstatements set forth herein were made intentionally, knowingly or recklessly by Defendants.

108. This Claim For Relief for control person liability is brought under Section 15 of the Securities Act against the Individual Defendants.

109. The Individual Defendants, individually and jointly, were control persons under Section 15 by virtue of their senior executive officer and/or directorial positions at the Company.

110. As senior officers and/or directors of the Company, the Individual Defendants had a duty to have the controlled persons issue materially accurate information in the Prospectus.

111.    The Individual Defendants at all relevant times were able to and did control the Company's day-to-day operations, financial statements, and public filings.

112.    The Individual Defendants at all relevant times were able to and did control the contents of the Prospectus, which contained material misstatements and material omissions; the issuance of the Prospectus; had and exercised the power and influence to cause the Company to engage in the unlawful conduct complained of herein, and had the power to cause some or all of the other defendants to refrain from the conduct complained of herein.

113.    The Individual Defendants each violated Section 11 of the Securities Act as participants in the preparation and/or issuance of the Prospectus, and signed the Registration Statement.  By virtue of their positions as controlling persons, each of the Individual Defendants is also liable pursuant to Section 15 of the Securities Act.

114.    While the following concerns an affirmative defense that can be raised by only these control person defendants, and concerning which they bear the burden of proof, nevertheless, Plaintiffs allege that each of these defendants, as a controlling person, cannot prove that he or she: (a) had no knowledge of the existence of the facts by reason of which the liability of the controlled person is alleged to exist; or (b) had no reasonable grounds to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

115.    The Individual Defendants, individually and jointly, are each liable under Section 15 as a control person of the other defendants who are primarily liable under Section 11, and each defendant on this claim is liable to Plaintiffs and the other members of the Class, in an amount to be proved at trial.

## **REQUESTS FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment individually and on behalf of the Class against Defendants, jointly and severally, as follows:

A.     An order declaring this action to be a class action properly maintained pursuant to the Federal Rules of Civil Procedure, including Rules 23(a) and (b)(3), certifying the Class, and certifying their counsel as Class Counsel;

B.     Against Defendants, jointly and severally, for damages suffered as a result of Defendants' violations of the Securities Act, and/or awarding rescission under Section 12 of the Securities Act, in an amount to be proven at trial;

C.     Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.     Awarding Plaintiffs and the Class such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  November 27, 2012

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

GREGORY M. NESPOLE
DEMET BASAR
270 Madison Avenue
New York, New York 10016
Telephone:  212/545-4600
Facsimile:   212/545-4653

Attorneys for Plaintiffs

703632

## PLAINTIFF'S CERTIFICATION

Leona Sesholtz ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transactions in **Hi-Crush Partners LP (ticker "HCLP")** securities during the Class Period specified in the Complaint are as follows:

| Date | # of Shares | Buy/Sell | Price |
|------|-------------|----------|-------|
| 8/27/12 | 500 | Buy | 19.8355 |
| 8/27/12 | 250 | Buy | 19.99 |

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

6.    To the extent plaintiff has served as a representative party for a class in an action filed under the federal securities laws, the cases are listed below, if applicable:

7.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _21_ day of _November_, 2012.

_Leona Sesholtz_
Signature

_LEONA  SESHOLTZ_
Print Name

/703252

_Giovanny Delmas_    11/24/1

GIOVANNY DELMAS
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Sept. 26, 2013

## PLAINTIFF'S CERTIFICATION

ALEXANDER William THIELE ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transactions in **Hi-Crush Partners LP (ticker "HCLP")** securities during the Class Period specified in the Complaint are as follows:

| Date | # of Shares | Buy/Sell | Price |
|------|-------------|----------|-------|
| 8/20/2012 | 51.00 | Buy | 19.4599 |
| 9/25/2012 | 44.00 | Buy | 22.5999 |
| 10/22/2012 | 5.00 | Buy | 21.0599 |
| 11/13/2012 | 125.00 | Buy | 14.7399 |
| 11/15/2012 | 1.142 | Buy / Div reinvest | 20.80 |

5.      During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

6.      To the extent plaintiff has served as a representative party for a class in an action filed under the federal securities laws, the cases are listed below, if applicable:

7.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of November , 2012.


Signature

ALEXANDER TEELE
Print Name

/703252